### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CARLOS DUVERGEL,<br>JUAN CRESPO,<br>  a/k/a "Papo,"<br>FELIX CASTILLO,<br>  a/k/a "Mayito,"<br>ASNAY FERNANDEZ, and<br>ISMAEL MANZANO-SUAREZ | Criminal Action No.: 19-cr-922 (PGS)<br><br><br>**MEMORANDUM** |

This matter is before the Court on motions for acquittal pursuant to Federal Rule of Criminal Procedure Rule 29, and also motions for a new trial pursuant to Rule 33.  Defendants Carlos Duvergel ("Duvergel")[1], Juan Crespo ("Crespo"), Felix Castillo ("Castillo"), Asnay Fernandez ("Fernandez"), and Ismael Manzano-Suarez ("Manzano-Suarez") were each charged, tried, and convicted of: (1) conspiracy to transport stolen property in interstate commerce in violation of 18 U.S.C. §§ 2314, 371; and (2) interstate transportation of stolen property in violation of 18 U.S.C. § 2314. There was  a seven day trial and the jury found the

---

[1]     Mr. Duvergel's attorney joined the motions filed by the other defendants by letter dated May 20, 2022 (ECF No. 170).

defendants guilty on both counts. Oral argument on the pending motions were heard via telephone on August 16, 2022. For the reasons set forth below, all of the defendants' motions are denied.

## I.

By way of background, Count One of the Superseding Indictment charged all five defendants with conspiring to unlawfully transport, transmit, and transfer more than $5,000 of stolen perfume products from New Jersey to Florida. Specifically, it alleged that in or around October 2017 through May 2018, the defendants conspired to steal perfume products from a location in Edison, New Jersey, and then transport the stolen perfume to Florida for sale. (ECF No. 57).

Count Two of the Superseding Indictment charged each defendant with interstate transportation of stolen property. Specifically, it alleged that the defendants in or around October 2017 through November 2017 transported more than $5,000 of stolen perfume products from the Edison, New Jersey perfume distributor to Florida. (ECF No. 57). Within the indictment, Count Two covers a brief period of time of one month (October – November, 2017); while Count One of the conspiracy charge covers a longer period (approximately 7 months).  The reason is that as part of the conspiracy, there was an additional attempted burglary at a different distributor located in New Brunswick, New Jersey.

The trial commenced on March 23, 2022. The government called Hedy Friedman, owner of Continental Cosmetiques in Edison, New Jersey ("Continental"). She testified that upon entering her warehouse on Monday November 6, 2017, she found that it had been burglarized over the weekend and roughly half of her perfume products were missing. (T. 409:13-410: 25).

Next, the government introduced extensive photographic evidence of the Continental crime scene through the testimony of Steven Todd, a detective for the Edison Police Department. Video surveillance between midday November 5th and the early morning of November 6th from a neighboring business was introduced (T. 197:14-198:18). Det. Todd testified that he was unable to identify any of the burglars from the video, but he could see a minivan loitering in the area during a time when there was little or no traffic (T. 212:3-213:19), and a white semi-truck hauling two trailers to and from Continental's loading dock. (T. 215:8-216:8). Det. Todd testified that another contemporary video pulled from a nearby New Jersey Turnpike toll booth area allowed him to identify the white semi-truck as a 2007 Freightliner owned by Duvergel, and the minivan as a Chrysler Pacifica owned by Avis Budget Rent-A-Car. (T. 226:12-229:7). Det. Todd investigated the rented car and found Duvergel rented the minivan from Avis at the Louisville Kentucky Airport on November 2, 2017 and returned it to the same location on November 6, 2017, with approximately 2,000 miles added to the odometer. (T. 247:8-249:20).

The relevant rental agreement was admitted into evidence. (T. 247:6-248:7). Det. Todd then linked the Chase credit card used by Duvergel on the car rental agreement, and his phone number, to reserve lodging at the Extended Stay America hotel in Elizabeth, New Jersey between November 2 and 5, 2017, about eighteen miles from Continental. (T. 249:25-252:4).

Det. Todd testified that investigators later received notice from the Medley Police Department in Florida that Duvergel's Freightliner had recently been stolen. (T. 252:5-10). The reporting person, Yunior Estevez ("Estevez"), had provided his information to the Medley Police including his phone number, and several phone numbers for Duvergel, the truck's owner. (T. 252:20-253:3). From the report, Det. Todd learned that the Freightliner had an active GPS unit. (T. 253:3-5). Det. Todd testified that investigators obtained a tracking report from the GPS company which showed the Freightliner had traveled from Miami to Elizabeth and back between October 29, 2017 and November 7, 2017. (T. 253:24-254:4). Further, the tracking report indicated the truck was located immediately near the Extended Stay America hotel on November 4, 2017 and near Continental on November 5, 2017. (T. 254:5-24).

Det. Todd's investigation went cold for a while until a similar burglary occurred. As another conspiratorial act, the government called Diler Nagpal, owner of the fragrance company TJS Group, LLC ("TJS") of East Brunswick, New

Jersey. Mr. Nagpal testified that while he was in Detroit for vacation on May 27, 2018, he was alerted to a late night break burglary at his TJS warehouse in East Brunswick. (T. 60:22-62:7). He could remotely view the business' surveillance system on his cell phone, and he saw several intruders in the building, so he called 911. (T. 61:22-62:7).

Justin Schlusselfeld, a patrol officer of the East Brunswick Police Department, testified that he responded to the reported TJS burglary and, along with other officers, encountered a Chevy SUV leaving the empty parking lot. (T. 97:20-99:5). Video footage from police vehicle cameras showed the officers stopping the SUV and removing the five defendants as they were arrested and entered into separate police vehicles. (T. 99:15-139:11). The officers recovered assorted burglary tools from the SUV (T. 104:25-105:8) and arrested the five defendants. Officer Schlusselfeld testified that certain pedigree information was obtained from each defendant, including phone numbers and home addresses. Officer Schlusselfeld then noted that Duvergel had provided a home address in Colorado Springs, Colorado and the other four defendants each provided their respective addresses in Hialeah, Florida. (T. 140:25-144:15).

Due to the similar nature of the TJS and Continental burglaries, Det. Todd indicated that the aforementioned phone numbers for the five defendants were forwarded to him by the Middlesex County Prosecutor's Office. (T. 262:13-

263:10). He testified that cell tower data for the collective phone numbers was pulled and communicated to the FBI. (T. 313:25-314:4).

The government called Special Agent John Hauger, a member of the FBI's Cellular Analysis Survey Team ("CAST"), who testified about how he tracked the provided phone numbers for the defendants. His testimony linked the Defendants to the Continental burglary. Specifically, he testified that one of the phones associated with Duvergel was in Louisville, Kentucky between October 30, 2017 and November 2, 2017 before traveling east to Elizabeth, New Jersey (T. 754:18-755:18) where the other four defendants' phones were clustered. Agent Hauger then explained how these phones seemed to remain in Elizabeth, New Jersey around the time of the Continental burglary before leaving on November 6, 2017, traveling south, and arriving near Hialeah and Miami, Florida on November 7, 2017. (T. 724:14-776:19).

Finally, the government called Estevez as a cooperating witness, and Defendants' attorneys impeached his credibility. Estevez testified that during the Continental burglary, Duvergel drove the rented minivan to the warehouse where he dropped off Crespo, Castillo, and Fernandez to break in (T. 643:24-644:1) while he (Estevez) and Manzano-Suarez waited nearby in the Freightliner as lookouts. (T. 511:19-512:7). Estevez noted that once the others had entered Continental's premises and were ready to load the stolen perfume products, Manzano-Suarez

6

exited the truck to serve as lookout down the road (T. 522:9-12) while he (Estevez) maneuvered two trailers to Continental's loading dock to seize the stolen products. Estevez testified that he initiated the loading process upon the instructions via cell phone from Duvergel and/or Crespo. (T. 515:7-11).

Upon completion of loading the second trailer around midnight on November, 6, 2017, Estevez hauled one trailer to Miami, Florida where it was reportedly offloaded by Crespo, Castillo, and Fernandez. (T. 525:22-528:18). The second trailer was transported by an unnamed second driver to Jacksonville, Florida because the second driver would not want to drive to Miami so Estevez testified that he had to later drive up to Jacksonville to retrieve the other trailer. (T. 256:18-527:9, 258:19-530:2).

Because he was reportedly paid less than what he was promised, Estevez withheld the second trailer from the defendants, reporting it and the Freightliner were stolen. (T. 530:23-531:5). Estivez testified that the other defendants did not believe his story and attempted to recover the trailer of stolen goods from him through various means, culminating in a confrontation at an undisclosed ranch. At that time, Estevez was tied up and beaten by Crespo, Castillo, and a third, unknown individual as they threatened to cut his fingers off, pulled a gun on him, soaked him in gasoline, and held a lighter to his face before he capitulated,

disclosed the trailer's location, and was dropped off at a Wendy's. (T. 543:17-545:17).

On April 5, 2022, following close of the government's case but before closing arguments, each defendant moved for a judgment of acquittal pursuant to Rule 29(a) and the Court reserved its decision pursuant to Rule 29(b). (T. 820:2-14). The jury was then instructed and began deliberations on April 6, 2022, returning a guilty verdict on both Counts for each defendant the same day. (ECF No. 144).

## II.

When considering a Rule 29 motion, the district court shall enter a judgment of acquittal if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The court must determine whether "any rational trier of fact could have found proof of the defendant's guilt beyond a reasonable doubt based upon the available evidence." *United States v. Smith*, 294 F.3d. 473, 476 (3d Cir. 2002) (internal citation omitted). In considering such, the Court is "vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment of that of the jury." *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (internal citation omitted).

The district court must view the evidence in its entirety and in the light most favorable to the government such that the government is entitled to "the benefit of

inferences that may be drawn from the evidence, and the evidence may be considered probative even if it is circumstantial." *United States v. Pecora*, 798 F.2d 614, 618 (3d Cir. 1986) (citing *Government of the Virgin Islands v. Williams*, 739 F.2d 936, 940 (3d Cir. 1984)). The defendants thus bear a "heavy burden in light of [the Third Circuit's] 'particularly deferential' standard of review in cases challenging the sufficiency of the evidence." *See United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990); *United States v. Young*, 334 F. App'x 477, 480 (3d Cir. 2009) (quoting *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)).

The Third Circuit counsels that judgments of acquittal should "be confined to cases where the prosecution failure is clear." *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). Accordingly, the "evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Pungitore*, 910 F.2d 1084, 1129 (3d Cir. 1990). "[A]n acquittal should only be reserved in instances where 'no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.'" *United States v. Lucas*, 2015 U.S. Dist. LEXIS 59644, at *8 (quoting *United States v. Salmon*, 944 F.2d 1106, 1113 (3dCir. 1991)).

Regarding defendants' motions for a new trial under Rule 33, the court may "vacate any judgment and grant a new trial if the interest of justice so requires."

Fed. R. Crim. P. 33(a). However, this relief is to be limited to those cases where the court "believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (internal quotation and citation omitted).

## III.

The defendants present numerous arguments in favor of granting either judgments of acquittal or a new trial. Where individual arguments from different defendants pertain largely to a common point, the Court will address those multiple arguments from multiple defendants together. Otherwise, the Court considers each argument from each defendant separately.

In addition, several Rule 29 motions were made at trial with a decision reserved and so the Court "must decide [those] motion[s] on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. 29(b). Because the defendants made their Rule 29 motions following the close of the government's case and immediately rested (T. 813:25-814:18, 820:2-15), the evidence considered here is essentially the same.

   a. Crespo, Manzano-Suarez, Fernandez, and Castillo argue the jury verdict was against the weight of the evidence

First, each defendant asserts that the jury's verdict was against the weight of evidence adduced:

- Crespo argues that Estevez's assertion that Crespo was present at the Continental site relaying instructions via cell phone was contradicted by Agent Hauger's testimony that Crespo's phone was miles away in Elizabeth. (Crespo Motion at 7-8, ECF No. 166). Further, Crespo emphasizes that no other evidence aside from Estevez's questionable testimony placed Crespo at the Continental site. *Id.*

- Manzano-Suarez argues numerous points on the matter, noting in part that the Continental burglary was not witnessed, no identifications at Continental could be made from the surveillance video, the trailers used were never recovered, and no cell data placed Manzano-Suarez at the site of the Continental burglary. (Manzano-Suarez Motion at 2, ECF No. 167). He also questions the utility of Estevez's testimony, including the logic of having two lookouts in the same truck, his omissions in prior proffers, and his overall credibility. *Id.*

- Fernandez in turn argues that Estevez's assertion that Fernandez was present at the Continental burglary was impossible, noting how Agent Hauger testified to tracking Fernandez's phone in North Carolina only five hours after the burglary, a distance Fernandez says he could not have crossed in that time. (Fernandez Motion at 2-3, ECF No. 168).

- Castillo argues that the phone records simply show that his phone was present in Elizabeth and was not near the Continental burglary site in Edison. (Castillo Motion at 1-3, ECF No. 169). He also lodges numerous arguments about the credibility of Estevez's testimony, including his changing stories, his criminal character, and the incredulity of his claims of interrogation at the ranch. *Id.*

To the contrary, the government introduced ample evidence from which a rational jury could find proof of guilt beyond a reasonable doubt for each defendant. *Smith*, 294 F.3d at 476. The surveillance footage from the Continental burglary allowed authorities to positively link the visible Freightliner and minivan to Duvergel, as well as the Elizabeth hotel. After the five defendants were arrested following the TJS burglary, the phone numbers they gave to police were forwarded to investigators from the Continental burglary and later to the FBI. The location data from these phone numbers, dating back to October 2017, placed Duvergel's phone near Louisville where the minivan was rented and showed it traveled all the way to Elizabeth around the time of the Continental burglary before departing back to Louisville immediately after. At the same time, the other four defendants were not in Hialeah, but instead also in Elizabeth, later traveling to Florida around the same time immediately after the Continental burglary.

Estevez's testimony then tied all five defendants together and offered a plausible account for how each defendant participated in the overall conspiracy and facilitated the interstate shipping of stolen goods from the Continental burglary. Finally, the abundance of evidence from the attempted TJS burglary conclusively showed each defendant participating in an overt act to further the conspiracy should Estevez's testimony not prove to be persuasive. Accordingly, considered in the light most favorable to the government, I find that none of the defendants' arguments overcome the weight of the evidence presented.

Regarding the remaining arguments, several defendants argued that their phones' tracked presence in Elizabeth at the time of the Continental burglary meant they could not be tied to the heist, but Det. Todd in his testimony explained how criminals engaged in burglary frequently leave their phones at home and utilize prepaid burner phones that are difficult to track. (T. 400:6-18). A jury could reasonably conclude that the defendants met in Elizabeth around the same time as the Continental burglary, departed around the same time, and could very well have participated in the Continental burglary while their phones remained in Elizabeth.

As for Fernandez's argument about his phone being located in North Carolina just five hours after the apparent end of the Continental burglary was an issue for the jury to decide. The jury concluded, as the government suggested (T. 918:12-919:6), that Fernandez left the Continental site earlier with the second

13

driver Estevez had mentioned, and thereby could have traveled to North Carolina by 5:00 a.m.

Defendants' remaining arguments on the weight of the evidence turn on the credibility of Estevez's account of the events, but these fall flat. His testimony was impeached and his testimony was inconsistent and incredulous for the most part. Estevez was cross examined extensively by five defense attorneys on each alleged inconsistency and questionable fact, and his apparent lack of credibility made a focal point of defense counsels' closing arguments. (T. 844:22-909:7). The jury therefore considered Estevez's testimony in light of each credibility concern and still returned a guilty verdict. Because it is not for the Court "to usurp the role of the jury by weighing [witness] credibility and assigning weigh to the evidence," especially when surrounded by other potentially probative evidence, there is no reason to disturb the jury's determination. *See Flores*, 454 F.3d at 154.

b. <u>Crespo argues that the government knowingly used false testimony</u>

Crespo also contends that a judgment of acquittal or new trial is warranted because the government, through Estevez, misrepresented the nature of the cooperation agreement to the jury. (Crespo Motion at 4-7). Crespo highlights the following exchange between Estevez and the government, discussing the cooperation agreement that Estevez had signed:

Q. What's your understanding of what you promised to do by
signing this cooperation agreement?
A. State the truth of what happened.
Q. Say that again please?
A. To say the truth.
Q. To say the truth; say the truth about what?
A. What happened that day at the burglary.
Q. And what happens if you don't say the truth about what
happened at the burglary?
A. If I don't say -- if I don't say the truth I face the
maximum penalty.
Q. What happens to this treatment?
A. It's voided.
Q. What's your expectation of what the U.S. Attorney's
Office will do in exchange for your cooperation and
truthful
testimony?
A. Nothing.
Q. Has the Government promised you a lesser sentence in
exchange for your cooperation?
A. No.
**Q. Has the Government made any promises for you?**
**A. No.**
Q. Will the Government inform the judge about your
cooperation?
A. Yes.
Q. And who determines your sentence when you do appear for
sentencing?
A. The judge.
Q. Are you testifying in court today based on that
cooperation agreement?
A.   Yes.
...
Q. Has anyone promised you what your sentence will be when
you get sentenced by the judge?
A. No.

(T. 504:7-505:12, 672:24-673:1) (emphasis added). Crespo notes that Estevez's

cooperation agreement provides that should Estevez comply with the agreement

and provide substantial assistance through his testimony, the government would

recommend a downward departure from the sentencing guidelines to Estevez's

sentencing judge and suggest a term of 30-37 months. (Crespo Motion at 3-4). By answering no to the government's questions of whether it had "made any promises to [Estevez]," Crespo claims Estevez provided false testimony and thus requires granting a new trial. *Id.* at 4-7. In making this point, Crespo relies on *Napue v. Illinois*, 360 U.S. 264 (1959).

In *Napue*, the Supreme Court found that the defendant was entitled to post-conviction relief because at trial, the prosecutor had failed to correct a witness's false testimony as it pertained to a promised recommendation for reduction of sentence. The witness, a co-participant in the underlying crime who had already plead guilty and been sentenced, had been promised by the prosecutor that he (the prosecutor) would made a recommendation to the judge for a reduction in the witness's sentence. *Napue*, 360 U.S. at 266. The Supreme Court therefore found reversible error when the prosecutor questioned the witness:

```
Q. Mr. Hamer, has Judge Prystalski [the trial judge]
promised you any reduction of sentence?
A. No, sir.
Q. Have I promised you that I would recommend any reduction
of sentence to anybody?
A. You did not. [That answer was false and known to be so
by the prosecutor.]
Q. Has any Judge of the criminal court promised that they
[sic] would reduce your sentence?
A. No, sir.
Q. Has any representative of the Parole Board been to see
you and promised you a reduction of sentence?
A. No, sir.
Q. Has any representative of the Governor of the State of
Illinois promised you a reduction of sentence?
A. No, sir."
```

*Id.* at 270-71 (bracketed comments original).

Because the prosecutor knew the witness's testimony regarding the reduced sentence recommendation to be false and failed to correct it, the Supreme Court found that it may have had an impermissible effect on the trial's outcome and reversed the state supreme court. *Id.* at 271-72. Nonetheless, the present circumstances are distinguishable from those of *Napue*. In *Napue*, the prosecutor asked the witness specifically if a recommendation for reduced sentence had been offered by anyone, and the witness answered negatively five times, including one time when the prosecutor failed to correct him.

By contrast, the government here discussed the cooperation agreement in far more general terms. The government's questioning made clear to the jury that if Estevez did not "say the truth about what happened at the [Continental] burglary," he would "face the maximum penalty" for his role in the crime. (T. 504:14-17). The government then attempted to explain how Estevez stood to benefit from cooperating.

When asked what he expected the government to do in exchange for his truthful testimony, Estevez claimed "nothing," whereupon the government then clarified by asking whether Estevez had been promised a lesser sentence. (T. 504:20-25). Estevez again answered in the negative and even answered no when asked if "any promises" had been made. (T. 505:1-3). However, the government

continued its questioning and Estevez then admitted that his truthful testimony would prompt the government to inform the sentencing judge of his cooperation and that was his motivation for testifying. (T. 505:4-12). Overall, when asked in very specific terms during cross-examination whether he was testifying to try and earn a recommendation for reduced sentence from the government, Estevez confirmed same to the jury. (T. 565:4-566:11, 686:20-3).

Outside of Estevez's testimony, the Court introduced and/or instructed the jury on two occasions. First, during the voir dire, the Court included a question regarding the issue of cooperating witnesses. The voir dire question was as follows:

> 31.    During this trial, you may hear testimony from an alleged co-conspirator, someone who says he participated in the crime charged. Such an individual may cooperate with law enforcement authorities and offer testimony as a witness in exchange for consideration of a more lenient sentence for himself. Do you have any opinions about the testimony of such a witness which would affect your ability to be fair and impartial juror?

Secondly, the Court charged the jury about the cooperating witness. The instructions was read and also presented in a writing:

> CREDIBILITY OF WITNESSES - WITNESS WHO HAS PLEADED GUILTY TO SAME OR RELATED OFFENSE, ACCOMPLICES, COOPERATING WITNESS
>
> You have heard evidence that Yunior Estevez is an alleged co-conspirator who says he participated in the crime charged, and has made a plea agreement with the Government.

18

His testimony was received in evidence and may be considered by you. The Government is permitted to present the testimony of someone who has reached a plea bargain with the Government in exchange for his testimony, but you should consider the testimony of Yunior Estevez with great care and caution. In evaluating Yunior Estevez's testimony, you should consider this factor along with the others I have called to your attention. Whether or not his testimony may have been influenced by the plea agreement is for you to determine. You may give his testimony such weight as you think it deserves.

You must not consider Yunior Estevez's guilty plea as any evidence of any defendant's guilt. His decision to plead guilty was a personal decision about his own guilt. Such evidence is offered only to allow you to assess the credibility of the witness; to eliminate any concern that any defendant has been singled out for prosecution; and to explain how the witness came to possess detailed first-hand knowledge of the events about which he testified. You may consider Yunior Estevez's guilty plea only for these purposes.

"A new trial is required if the false testimony could … in any reasonable likelihood have affected the judgment of the jury[.]" *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271) (internal quotation omitted). Here, the government satisfied its obligation to correct potentially false testimony when it clarified Estevez testified because the government would report to the sentencing judge that he had cooperated. The government's subsequent questions and Estevez's later testimony during cross would have made clear to the jury that he was cooperating to obtain some sort of benefit. Accordingly, Crespo's

argument is rejected.[2]  In addition, the instruction and the voir dire question alerted the jury to the nature of the cooperation agreement.

c.  Castillo argues the Court erred in allowing in evidence of the TJS arrests

Aside from his above objections to the weight of the evidence, Castillo argues generally that the video from the attempted TJS burglary wherein the five defendants' were arrested and placed into a police vehicle was improperly included as it unfairly prejudiced the jury. (Castillo Motion at 1). As he explains it, the evidence from their "involvement in a similar burglary made it virtually impossible for the jury to adequately consider the totality of the evidence." *Id*.

This was a conspiracy case, and in conspiracy cases, the conspiracy "may be proven by direct or circumstantial evidence, and a jury may infer the existence of a conspiracy based on the totality of the evidence." *United States v. Kusi*, 2021 U.S. App. LEXIS 34953, at *5 (3d Cir. Nov. 24, 2021) (citing *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005)). However, conspiracy "cannot be proven by piling inference upon inference where those inferences do not logically support the ultimate finding of guilt." *Brodie*, 403 F.3d at 134 (internal citation and quotation

---

[2]   I similarly reject Crespo's secondary argument that Estevez lied when asked about the potential sentencing he faces. (Crespo Motion at 2-3). When asked by the government what the maximum jail sentence was for the two charges he plead guilty to, Estevez answered ten and five years. (T. 502:2-4). Although Crespo tries to argue that Estevez lied here because the stipulated sentencing table in the cooperation agreement exposed Estevez to only 30-37 months in prison. This argument unpersuasive because Estevez answered the question by correctly listing the maximum sentence prescribed by each statutes he plead guilty to. *See* 18 U.S.C. § 2314 (ten years); 18 U.S.C. § 371 (five years).

omitted).  Consequently, the court must give "close scrutiny to the sufficiency of the government's evidence" given that "slight evidence of a defendant's connection with a conspiracy is insufficient to support a guilty verdict ... [as] guilt must remain personal and individual." *See id.* (internal citation and quotation omitted).

Here, the Superseding Indictment charged the defendants with conspiracy to unlawfully transport assorted perfume products from New Jersey, knowing same to be stolen, down to Florida for resale between October 2017 and May 2018. (ECF No. 57). Not only did the attempted TJS burglary take place within the alleged timeframe of the conspiracy, but the Superseding Indictment expressly includes such as an overt act. *Id.*  The evidence from the attempted TJS burglary clearly showed all five defendants acquainted with each other and in an overt, concerted effort (within the scope of the charged conspiracy) to acquire perfume products to transport and sell, all of which they would know to be stolen because they were the ones stealing the products. This highly relevant and probative evidence from the attempted TJS burglary tended to prove one of the alleged acts of the conspiracy and was in fact accompanied by a limiting instruction (T. 954:3-11). Castillo's argument here is therefore rejected.

d. <u>Manzano-Suarez argues the Court erred in allowing in evidence of the assault on Estevez</u>

Next, Manzano-Suarez argues that it was improper and highly prejudicial to allow in Estevez's testimony regarding the alleged interrogation and assault at the ranch after he reported the Freightliner and trailer stolen. (Manzano-Suarez Motion at 3-6). The Court originally heard this matter during the parties' motions in limine, during which the government argued that the evidence was admissible as intrinsic evidence of the conspiracy because it was performed contemporaneously with the charged crime and facilitated the commission of the charged crime, or alternatively as admissible under Fed. R. Evid. 404(b).

The Court eventually allowed the government to admit such (ECF No. 127), but held a Rule 104 hearing during trial, while the jury was in recess, to allow defense counsel to cross-examine Estevez prior to presentation to the jury. (T. 484:22-494:21). Because Manzano-Suarez's objections are largely the same as those raised during motions in limine, the Court will simply reference and rely on its previous reasoning on the record from immediately prior to trial. (ECF No. 128).

e.  <u>Manzano-Suarez argues the Court erred in allowing proof of his plea to State charges</u>

Manzano-Suarez also argues that the Court erred by allowing in proof of Manzano-Suarez's March 2019 plea colloquy in state court on an attempted burglary charge. (Manzano-Suarez Motion at 6-11).

Prior to trial, several of the defendants sought to preclude the government from introducing the March 11, 2019 plea hearing transcript from the Superior Court of New Jersey wherein the five defendants admitted to participating in the attempted TJS burglary. (ECF Nos. 118, 122, 124). The Court originally granted the defendants' motions in limine, finding that the government would be able to prove the defendants' overt act (the TJS attempted burglary) and subsequent arrest through other, less prejudicial means.

During the cross examination of Officer Schlusselfeld, however, defense counsel challenged the validity of defendants' arrest at the TJS site by inquiring into the police's use of gloves and collection of fingerprints. (T. 151:6-153:14). As a result of the challenge to the arrest, the government sought to rebut same by entering evidence of the defendants' state plea colloquies into evidence. (T. 432:6-12). The Court granted same for the reasons set forth on the record. (T. 458:13-463:3). Rather than allow the state plea transcripts to be admitted, the parties agreed to enter a stipulation. (T. 476:2-480:1). The parties thus entered Stipulation 6, stating that the defendants' arrest at the TJS site was lawful and that the

defendants themselves had admitted such in "other court proceedings." (T. 812:5-813:16).

Manzano-Suarez argues now, as he did in his pre-trial motion in limine (ECF No. 124), that admission of the colloquy from his state guilty plea would be improper because his plea was made pursuant to entry into New Jersey's Pre-Trial Intervention ("PTI") program. (Manzano-Suarez Motion at 8). Since successful completion of PTI would result in dismissal of the attempted burglary charge and thus no sentencing, he avers that there was no "evidence of a final judgment of conviction" to allow for admission under Fed. R. Evid. 803(22), citing to the additional protections afforded to PTI participants under New Jersey statutes and court rules. *Id.* at 8-9. Further, he raises additional arguments about potential constitutional infirmities with his guilty plea and how admission of the defendants' plea colloquies would raise *Bruton*[3] concerns because each defendant's plea in some way referenced the co-defendants. *Id.* By reversing course on its original decision, Manzano-Suarez argues the Court erred because it forced him to choose between "having his plea colloquy entered into evidence or proceeding by flawed stipulation in some attempt to limit inappropriate evidence." *Id.*

The Court disagrees that it "forced" said choice. When deciding the original motions in limine, the defendants' admission to being arrested for the TJS burglary

---

[3] *Bruton v. United States*, 391 U.S. 123 (1968).

was not appropriate as the government could prove the overt acts alleged in the

Superseding Indictment through other evidence. However, challenging this arrest

on cross-examination, defense counsel opened the door for the government to

present such evidence.  After explaining my reasoning, the parties voluntarily

entered into a stipulation to moot the concern that defendants were challenging the

validity of the defendants' arrest. By doing so, the colloquies themselves were not

admitted and so the alleged infirmities of Manzano-Suarez's plea and potential

*Bruton* concerns were avoided.

 f. <u>Manzano-Suarez argues the Court erred in permitting Det. Todd to
commentate over the playback of surveillance video from the Continental
burglary</u>

 Finally, Manzano-Suarez asserts that the Court erred when it allowed Det.

Todd to narrate the surveillance video from the Continental burglary. (Manzano-

Suarez Motion at 11-13). He argues that doing so constituted improper lay person

opinion under Fed. R. Evid. 701 because Det. Todd was commenting on such

despite having no firsthand knowledge, nor was he present at the site. (Manzano-

Suarez Motion at 11-12). Moreover, Det. Todd's status as a law enforcement agent

may had lent additional, improper authority to his narration and comments. *Id.*

 To the contrary, Det. Todd's testimony was largely based around identifying

what portions of the surveillance video proved useful in the subsequent

investigation and how they tied into the investigative efforts. Lay person opinion is

permitted when it is rationally based on a witness's perception and would be helpful to understanding the witness's testimony or determining a fact in issue. Fed. R. Evid. 701; *see also Government of the Virgin Islands v. Knight*, 989 F. 2d 619, 629-30 (3d. Cir. 1993). Here, Det. Todd's testimony was based on his own perceptions and useful for understanding his remaining testimony. He made clear that he was pointing out distinct elements within the video that might otherwise go unnoticed but which had an impact on the investigation.

As one example, Det. Todd noted that while reviewing the video, he zoomed in when the Freightliner truck appeared and noticed the truck had two different identifying mud flaps. (T. 205:24-206:4). It was useful to emphasize this detail as Det. Todd later testified that these distinct mud flaps were how he later identified the Freightliner. Further, his emphasizing of certain timestamps, coupled with his familiarity with the area depicted in the video, was useful in understanding why he requested specific video from specific highway cameras during specific time frames. (T. 224:24-225:4, 225:13-21). Det. Todd simply highlighted specific elements from the video (that the jury might not have focused on when played once at full speed) in order to segue into how each point advanced his investigation, in effect giving additional context to subsequent evidence. *See United States v. Torralba-Mendia*, 784 F.3d 652, 659 (9th Cir. 2015) ("an officer who has extensively reviewed a video may offer a narration, pointing our

particulars that a casual observer might not see"). Accordingly, I reject Manzano-Suarez's argument that allowing such was in error.

## IV.

For all the reasons set forth above, all of the defendants' outstanding motions are denied, and an Order as to each defendant follows.


_____

PETER G. SHERIDAN, U.S.D.J.